UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZOLFIA HEKMAT, et al.,<br><br>Petitioners,<br><br>v.<br><br>CHRISTOPHER CHESTNUT, et al.,<br><br>Respondents. | No.  1:25-cv-1674 DAD SCR<br><br><u>FINDINGS & RECOMMENDATIONS</u> |

Petitioners are federal immigration detainees proceeding through counsel in this habeas corpus action filed pursuant to 28 U.S.C. § 2241.  This action was referred to the undersigned by operation of Local Rule 302 and 28 U.S.C. § 636(b)(1).

**FACTUAL AND PROCEDURAL HISTORY**

Petitioner Zolfia Hekmat and her daughter, Petitioner Roya Mohammadi, are natives and citizens of Afghanistan.  Petitioners were threatened with death in Afghanistan by the Taliban and the family's father, Nasir, was severely injured in a bomb blast.  ECF No. 1 at 14-15, ¶ 44. Petitioners and their family fled to Iran to escape the Taliban and sought a way to come to the United States to request asylum.  They made their way to Mexico where they applied for an appointment through the CBP One App.  <u>Id.</u>

On or about May 26, 2024, Petitioners came to the San Ysidro Port of Entry to seek

1

1  asylum. On that same date, both Petitioners were granted humanitarian parole pursuant to 8

2  U.S.C. § 1182(d)(5), through May 24, 2026.[1]  ECF No. 1 at 15, ¶ 45; Exh. A to Petition, ECF No.

3  1-2 at 2-3; see also Declaration of Patrick J. Cruz ¶ 5, ECF No. 7-1 at 3 ("Cruz Decl.");

4  Declaration of Ana. L. Juarez ¶ 5, ECF No. 7-1 at 9 ("Juarez Decl."). On or about May 26, 2024,

5  Petitioners were placed into removal proceedings with notices to appear before an immigration

6  judge. ECF No. 1 at 14; Cruz Decl. ¶ 5; Juarez Decl. ¶ 5. Petitioners were issued work

7  authorization permits. ECF No. 1 at 15, ¶ 49.

8      Immigration and Customs Enforcement ("ICE") enrolled Petitioners into the Intensive

9  Supervision Appearance Program ("ISAP") on June 20, 2024. Cruz Decl. ¶ 6; Juarez Decl. ¶ 6.

10  Petitioners reported to the ICE office in Riverside, California, where they were fitted with

11  electronic monitoring bracelets and enrolled in the DMI SmartLink program on their cell phones.

12  Declaration of Roya Mohammadi, ECF No. 1-3 at 2 ("Mohammadi Decl."). After about three

13  months, ICE removed Petitioner Mohammadi's bracelet and continued to monitor her through the

14  SmartLink application. ICE later refitted Petitioner Mohammadi with a monitoring bracelet

15  during an appointment in September 2025. Id. Petitioner Hekmat continued to wear her bracelet

16  from that initial appointment until her detention in October 2025. Id.

17      On October 7, 2025, the Petitioners attended their respective asylum hearings. Petitioner

18  Mohammadi's hearing did not proceed because the court's computer system was not functioning,

19  and no interpreter was present. Mohammadi Decl. at 2. Petitioner Mohammadi's legal

20  representative informed her that the Immigration Judge and government attorney had reviewed

21  her case in summary form and reported no apparent issues. Both Petitioners' hearings were

22  postponed for four months. Id.

23      That same day after the hearing, Petitioner Mohammadi contacted ICE to inquire about

24  any updates on their next hearing. An officer informed Petitioner that there were no updates but

---

[1] At one point in the petition, Petitioners allege they were paroled under the separate procedures at 8 U.S.C. § 1226(a). ECF No. 1 at 2, ¶ 2. This appears to be untrue. Both I-94 forms affixed to the petition reflect "DT" statuses of admission, see ECF No. 1-2 at 2-3, which is the code for humanitarian parole under § 1182(d)(5). Noori v. LaRose, No. 25-CV-1824 GPC MSB, 2025 WL 2800149, at *3 (S.D. Cal. Oct. 1, 2025). Respondents also state that Petitioners were paroled under Section 212(d)(5) of the INA, i.e., 8 U.S.C. § 1182(d)(5). ECF No. 7 at 2.

instructed her to report to the Bakersfield office the next day. Mohammadi Decl. at 2. Petitioners reported to the ICE office the next day, October 8, 2025, at about 8:30 a.m. Id. Petitioner Hekmat was called first and escorted into another room where officers removed her bracelet and placed her in handcuffs and leg restraints. Id. Shortly after, Petitioner Mohammadi underwent the same procedure. Id. Petitioners were then transported to an ICE facility in Bakersfield where their fingerprints and photographs were taken and later moved to the California City Detention Center. Id. at 2-3.

Respondents state that ICE officers executed administrative warrants for arrest (Form I-200) because each Petitioner had violated the terms of their respective ISAP agreement. Cruz Decl. ¶ 11, Exh. 1; Juarez Decl. ¶ 9, Exh. 1. Specifically, Respondents assert that:

- Petitioner Hekmat violated her ISAP mandatory requirements by missing required check-ins on January 18, 2025, January 20, 2025, April 12, 2025, April 27, 2025, August 2, 2025, and August 16, 2025, and by failing to complete a biometric check-in on January 27, 2025.
- Petitioner Mohammadi violated her ISAP mandatory requirements by missing required check-ins on December 5, 2024, January 31, 2025, March 4, 2025, April 24, 2025, and August 19, 2025.

Cruz Decl. ¶¶ 8-10; Juarez Decl. ¶ 8. Petitioner Mohammadi maintains that she and her mother "consistently complied with all scheduled phone and in-person check-ins" and "promptly reported any address changes, technical issues, or notification errors related to monitoring devices." Mohammadi Decl. at 2.

Petitioners remain detained at the California City ICE Processing Center. Respondents maintain that their detention is pursuant to 8 U.S.C. § 1225(b)(2). Cruz Decl. ¶ 12; Juarez Decl. ¶ 10. Petitioner Hekmat's next scheduled immigration court hearing is on February 13, 2026, for final adjudication of the pending applications for relief from removal. Cruz Decl. ¶ 13. Petitioner's Mohammadi's hearing for the same purpose is scheduled for February 23, 2026. Juarez Decl. ¶ 11. Petitioners allege that they cannot provide for their families because their work authorizations are contingent on their parole status. ECF No. 1 at ¶ 49, 58.

Petitioners filed their 28 U.S.C. § 2241 petition on November 28, 2025. They raise three claims: (1) Violation of the Due Process Clause of the Fifth Amendment (Procedural Due

1  Process); (2) Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A); and (3)
2  Violation of the Fourth Amendment (Unreasonable Search and Seizure).  ECF No. 1 at 17-23.
3  Petitioners seek declaratory relief and ask the undersigned to issue a writ of habeas corpus
4  ordering Respondents to release them from custody and restrain their re-detention without further
5  order of the court.  Id. at 23.

**DISCUSSION**

7  **I.      Applicable Detention Statute**

8        The statutory and regulatory framework governing Petitioners' immigration proceedings,
9  their release on supervision, and the subsequent revocation of their parole is complex.  "Where a
10 [noncitizen] falls within this statutory scheme can affect whether his detention is mandatory or
11 discretionary, as well as the kind of review process available to him if he wishes to contest the
12 necessity of his detention."  Prieto-Romero v. Clark, 534 F.3d 1053, 1057 (9th Cir. 2008).
13       Petitioners were paroled in May 2024 pursuant to 8 U.S.C. § 1182(d)(5).  This provision
14 permits the government to temporarily release a noncitizen "for urgent humanitarian reasons or
15 significant public benefit."  Id.  However, the Parties disagree on what statute currently governs
16 petitioners' detention.  Respondents argue Petitioners are "lawfully detained under controlling
17 mandatory detention provisions" at 8 U.S.C. § 1225(b)(2).  ECF No. 7 at 1 at 1; see also id. at 4-5
18 ("Under the plain language of 1225(b)(2), the government is required to detain all aliens, like the
19 petitioners, who are present in the United States without admission and who are subject to
20 removal proceedings.").  Petitioners do not articulate which detention statute applies but spend a
21 considerable portion of their papers explaining why "the mandatory detention provision of §
22 1225(b)(2) does not apply to people like Petitioners who have already entered and were residing
23 in the United States at the time they were apprehended."  ECF No. 1 at 14, ¶ 41; see also id. at 8-
24 14; ECF No. 8 at 2.  Given that the due process analysis below would be the same even if
25 Petitioners are subject to a mandatory detention statute, the undersigned will not resolve this
26 dispute to get to the merits of Petitioners' claims.  See Chavarria v. Chestnut, No. 1:25-cv-1755
27 DAD AC, 2025 WL 3533606, at *5 n.3 (E.D. Cal. Dec. 9, 2025) (declining to address
28 respondents' argument that petitioner is subject to mandatory detention after determining

petitioner was released under § 1182(d)(5)(A) and is likely to succeed on the merits of due process claim).

## II. Fifth Amendment Procedural Due Process

### A. Petitioners Have a Constitutional Liberty Interest in Remaining on Parole

The undersigned will first address Petitioners' Fifth Amendment procedural due process claim. Petitioners assert a substantial liberty interest in remaining on parole and argue that the test articulated in Mathews v. Eldridge, 424 U.S. 319, 335 (1976) ("Mathews") governs their claim. Petitioners further allege that the government revoked their parole seven months before its expiration and without the procedural requirements codified at 8 U.S.C. § 1182(d)(5) and its implementing regulation, 8 C.F.R. § 212.5(e)(2)(i). ECF No. 1 at 18-19, ¶ 59. The government's consideration of those factors, Petitioners assert, would have led to a different result. Id.

In their response, Respondents argue that "the agency had a sound basis upon which to conclude that neither petitioner should remain at liberty given the number of times that each person failed to complete the required check in process or provide necessary biometric information." ECF No. 7 at 5. They do not otherwise engage with the Mathews factors. In their traverse, Petitioners reassert that Respondents deprived them of their constitutional liberty interests without following their own procedures for revoking humanitarian parole. ECF No. 8 at 3-4.

The undersigned agrees with Petitioners that Mathews governs their procedural due process claims.[2] "[T]he liberty of a parolee, although indeterminate, includes many of the core

---

[2] Respondents do not address whether Petitioners' have a constitutional liberty interest in remaining on humanitarian parole. They argue only that the relevant regulations "do not create independent substantive rights that override the statutory grant of detention authority." ECF No. 7 at 5 (quoting Morales Sanchez v. Bondi, No. 5:25-cv-2530 AB DTB, 2025 WL 3190816, at *3 (C.D. Cal. Oct. 3, 2025)). Although Petitioners cite parole regulations to support their application of the second Mathews factor, ECF No. 1 at 18-19, ¶ 59, they clearly assert a constitutional liberty interest. See ECF No. 1 at 18, ¶ 58; ECF No. 8 at 4. Morales Sanchez itself acknowledges that parole revocations are subject to constitutional limits. See 2025 WL 3190816, at *3 ("Courts have held that ICE's discretion includes the authority to revoke supervision and re-detain individuals, provided the detention complies with constitutional limitations.") (citing Zadvydas v. Davis, 533 U.S. 678, 701 (2001) and Rodriguez v. Hayes, 578 F.3d 1032, 1044 (9th Cir. 2009), opinion amended and superseded, 591 F.3d 1105 (9th Cir. 2010)).

values of unqualified liberty and its termination inflicts a grievous loss on the parolee and often others ... [thus it] must be seen within the protection of the [Fifth] Amendment." Morrissey v. Brewer, 408 U.S. 471, 482-483 (1972); see also Pinchi v. Noem, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) ("Although in some circumstances the initial decision to detain or release an individual may be within the government's discretion, the government's decision to release an individual from custody creates 'an implicit promise,' upon which that individual may rely, that their liberty 'will be revoked only if [they] fail[ ] to live up to the . . . conditions [of release].'") (quoting Morrissey, 408 U.S. at 482). Therefore, the undersigned follows the many district courts in the Ninth Circuit holding that noncitizens granted parole under § 1182(d)(5) have a liberty interest in their continued release, entitling them to certain due process protections, the extent of which are determined by applying the test provided in Mathews. See, e.g., Chavarria, 2025 WL 3533606, at *3 (collecting cases); D.L.C. v. Wofford, No. 1:25-cv-1996 DC JDP, 2026 WL 25511, at *4 (E.D. Cal. Jan. 5, 2026) (citing Chavarria and collecting even more recent cases recognizing that parole under 8 U.S.C. § 1182(d)(5)(A) entitles a noncitizen to certain due process rights under procedural due process).

### B. Application of Mathews Factors

The undersigned proceeds to consider whether due process requires written notice and a pre-detention hearing before a neutral adjudicator. Chavarria, 2025 WL 3533606, at *3. The Mathews test requires courts to consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.

Private Interest: Petitioners have a profound interest in their own personal freedom. See Doe v. Becerra, 787 F.Supp.3d 1083, 1093 (N.D. Cal. 2025) ("It cannot be gainsaid that Petitioner has a substantial private interest in maintaining his out-of-custody status. Freedom from imprisonment is at the core of the Due Process Clause.") (citing Zadvydas v. Davis, 533

U.S. 678 (2001).  Moreover, petitioners resided in the United States with their family for nearly a year and a half before their detention and have a private interest in remaining free on parole. Noori, 2025 WL 2800149, at *10 ("Petitioner has a private interest in remaining free, which developed over the year he resided in the United States."); J.E.H.G. v. Chesnut, No. 1:25-cv-01673 JLT SKO, 2025 WL 3523108, at *11 (E.D. Cal. Dec. 9, 2025) (finding private interest in remaining on humanitarian parole where "Petitioner pursued gainful employment, built relationships with her family and many in her community, and kept a clean criminal record."). Accordingly, this factor favors a finding that Petitioners' private interests have been affected by their detention.

Erroneous Deprivation: The risk of erroneous deprivation is particularly high when, as here, the record suggests Petitioners received no meaningful procedural safeguards.  Moreover, release on humanitarian parole necessarily required a finding that Petitioners posed neither "a security risk nor a risk of absconding."  8 C.F.R. § 212.5(b); Chavarria, 2025 WL 3533606, at *4; Noori, 2025 WL 2800149, at *3.  "Civil immigration detention is 'nonpunitive in purpose and effect' and is justified when a noncitizen presents as a danger to the community or risk of flight." D.L.C., 2026 WL 25511, at *5 (citing Zadvydas, 533 U.S. at 690).  Respondents do not argue Petitioners are a safety or flight risk, and the record does not reflect that the government reconsidered its determination at Petitioners' initial release that they did not pose a safety or flight risk.

The crux of Respondents' counterargument is that ICE arrested Petitioners for "repeatedly violating the terms of the ISAP agreement issued in conjunction with the agency's grant of parole." ECF No. 7 at 5; see also Juarez Decl. ¶ 9; Cruz Decl. ¶ 11.  Petitioners deny such violations.  Mohammadi Decl. at 2.  The record supports at least an inference that the alleged ISAP violations were a post hoc justification for Petitioners' detention.  For example, Petitioner Mohammadi states that at her asylum hearing on October 7, 2025, the day before her detention, the Immigration Judge informed her legal representative that her case presented "no issues."  Id. Further, the warrants for Petitioners' arrests dated the next day, October 8, 2025, make no mention of the ISAP violations.  See ECF No. 7-1 at 6, 12.

7

1    But even if Petitioners' arrests were not pretextual and instead were solely motivated by
2 ICE's legitimate determination of ISAP violations, it would not necessarily follow that Petitioners
3 can be detained for those violations without a hearing to determine whether they present either a
4 danger or a risk of flight. "That the Government may believe it has a valid reason to detain
5 Petitioner does not eliminate its obligation to effectuate the detention in a manner that comports
6 with due process." E.A. T.-B. v. Wamsley, 795 F. Supp. 3d 1316, 1322 (W.D. Wash. 2025); see
7 also Guillermo M.R. v. Kaiser, 791 F.Supp.3d 1021, 1037-38 (N.D. Cal. July 17, 2025) (finding
8 "undeniably stark" the risk of erroneous deprivation where the Government contends that
9 "notwithstanding a neutral arbiter's determination that Petitioner should be released, ICE is
10 entitled to unilaterally terminate the IJ's order by re-detaining Petitioner without a hearing for at
11 least six months, based on ICE's own determination in its sole discretion that additional
12 conditions of release unilaterally set by ICE had been violated"). Respondents do not refute that
13 Petitioners received no advance notice or process related to the alleged ISAP violations.

14    Nor do Respondents refute that the government detained Petitioners without written notice
15 or explanation related to the humanitarian basis of their parole. Parole revocations in the context
16 of the INA must occur on a case-by-case basis and only "when the purposes of such parole shall,
17 in the opinion of the Secretary of Homeland Security, have been served[.]" 8 U.S.C. §
18 1182(d)(5)(A); Mata Velasquez v. Kurzdorfer, 794 F. Supp. 3d 128, 146 (W.D.N.Y. 2025)
19 ("[B]oth common sense and the words of the statute require parole revocation to be analyzed on a
20 case-by-case basis and that a decision to revoke parole "must attend to the reasons an individual
21 [noncitizen] received parole."). The parole regulations require a "written notice" that "neither
22 humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the
23 United States." 8 C.F.R. § 212.5(e)(2)(i); Espinoza v. Kaiser, No. 1:25-cv-1101 JLT SKO, 2025
24 WL 2675785, at *7 (E.D. Cal. Sept. 18, 2025) (explaining regulatory framework for parole
25 revocation requirements). The government may forego written notice only upon the noncitizen's
26 departure from the United States, or, if not departed, at the expiration of the time for which parole
27 was authorized. 8 C.F.R. § 212.5(e)(1). Neither condition for excusing written notice was met
28 here. For all these reasons, the second Mathews factor also favors Petitioners.

  Government's Interest: Under this factor, the Court weighs the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail." Mathews, 424 U.S. at 335. Again, Respondents did not engage with the Mathews factors in their response. While Respondents may have some generalized interest in Petitioners' detention under any of the potentially applicable detention statutes, that interest would dissipate if Petitioners specifically do not present a danger or risk of flight. The undersigned also joins other district courts in the Ninth Circuit finding that costs and administrative burdens associated with additional process in the context of parole revocations are low. See Chavarria, 2025 WL 3533606, at *4 ("If respondents wish to re-detain petitioner, they need only provide him with written notice and a hearing before a neutral adjudicator."); Pinchi, 792 F. Supp. 3d at 1036 ("Indeed, it is likely that the cost to the government of detaining [petitioner] pending any bond hearing would significantly exceed the cost of providing her with a pre-detention hearing."); D.L.C., 2026 WL 25511, at *5 ("Custody hearings in immigration court are routine and impose a 'minimal' cost on the government."). This factor also weighs in favor of petitioners.

  Accordingly, the undersigned recommends that the petition for a writ of habeas corpus be granted and Respondents be ordered to release Petitioners immediately.[3] The undersigned further recommends that Respondents be enjoined and restrained from re-detaining Petitioners unless they provide Petitioners with written notice before a pre-deprivation bond hearing to be convened by a neutral decision maker, and demonstrate by clear and convincing evidence at such bond

---

[3] Respondents argue that "[i]f the court were to determine that any relevant regulations had not been followed in this case, the appropriate remedy for any such procedural deficiency would not be automatic release from custody. Rather, it would be to remedy the specific procedural deficiency that might be established." ECF No. 7 at 6. This request appears to be premised on Respondents' belief that Petitioners are, at most, entitled to relief addressing any regulatory violations and not deprivations of constitutional liberty interests. Release from custody is an appropriate remedy under present circumstances. See Y-Z-L-H v. Bostock, 792 F. Supp. 3d 1123, 1146-47 (D. Or. 2025) (granting habeas and ordering release where the government revoked petitioner's humanitarian parole without adequate explanation); Colina-Meira v. Lyons, No. 1:25-cv-1716 CSK P, 2025 WL 3769424, at *6 (E.D. Cal. Dec. 31, 2025) (granting habeas petition on basis of petitioner-parolee's procedural due process claim and ordering petitioner's immediate release).

hearing that petitioners are a flight risk or danger to the community such that their physical custody is legally justified. Having found that the Fifth Amendment Due Process Clause supports the granting of the petition in this case, in the interests of judicial economy, the undersigned declines to reach the remaining issues raised.

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. The petition for writ of habeas corpus (ECF No. 1) be GRANTED.

2. Respondents be required to immediately release Petitioners from detention.

3. Respondents be enjoined and restrained from re-detaining Petitioners unless they provide Petitioners with written notice before a pre-deprivation bond hearing to be convened by a neutral decision maker, and demonstrate by clear and convincing evidence at such bond hearing that petitioners are a flight risk or danger to the community such that their physical custody is legally justified.

4. Respondents be ordered to file a notice certifying compliance with the above provisions within two (2) days of the adoption of these findings and recommendations.

5. Judgement be entered in favor of Petitioners and the Clerk of the Court close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **seven days** after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The undersigned finds that a shortened objection period is warranted in this case given the nature of the relief at issue as well as the fact that the parties have had sufficient time to submit all of their arguments in written briefs. See United States v. Barney, 568 F.2d 134, 136 (9th Cir. 1978) (per curiam) (stating that 28 U.S.C. § 636(b)(1) sets the maximum objection period and not the minimum); see also Local Rule 304(b). The parties

////

////

////

are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 9, 2026

SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE